**IN THE UNITED STATES COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **Criminal No. 1:0101-CR-012** |
| | ) | **Sentencing Date: August 1, 2008** |
| **JUBAL DRAKE CULVER,** | ) | **The Honorable James C. Cacheris** |
| | ) | |
| **Defendant.** | ) | |

### DEFENDANT'S POSITION WITH REGARD TO SENTENCING

Pursuant to Rule 32 of the *Federal Rules of Criminal Procedure*, section 6A1.3 of the advisory *United States Sentencing Guidelines* (the "Guidelines"), and this Court's Policy Regarding Procedures to be Followed in Guideline Sentencing, the Defendant, Jubal Drake Culver, through counsel, states that he has received and reviewed the Presentence Investigation Report ("PSR") prepared in this case and its Addendum and submits the following objection to the application of the advisory Guidelines:  Mr. Culver's criminal history is overstated and this Court should depart under Guidelines § 4B1.3 from Criminal History Category II to Criminal History Category I.

For the reasons set forth below, Mr. Culver submits that the statutory mandatory minimum of 15 years is sufficient, and not greater than necessary, to accomplish the purposes of sentencing under 18 U.S.C. § 3553(a).

**I.      Introduction**

This is an unusual case.  Because Mr. Culver has a minimal criminal history, an exceptionally low likelihood of recidivism, and great potential to be a law-abiding citizen upon release, the 20 to 24 year sentence suggested by the advisory Guidelines (Mr. Culver's Guidelines range for Count 1 is 188 to 235 months and the sentence for Count 4 is five years, consecutive) is greater than

necessary.  For the following reasons, the mandatory minimum sentence of 15 years should be imposed:

- Mr. Culver is 25 years old and during his short adult life he has exhibited many of the characteristics of a good citizen – including attending college for three years, working full-time as a general manager of a business (having worked his way up from bathroom attendant), and aiding his father in providing for his two siblings.  In other words, he was a productive and responsible citizen until he made the misguided decision to participate in a drug conspiracy in order to make fast cash to assist his family during a difficult time.

- Empirical evidence gathered by the U.S. Sentencing Commission indicates that, based on Mr. Culver's Criminal History Score (two points), his likelihood of recidivism is as low as 3.6%.  This figure does not account for additional factors that indicate a low chance of recidivism – his education, work experience, and age at the time of release (40, if the mandatory minimum is imposed).

- Mr. Culver has not previously been incarcerated.  If he is sentenced at the low-end of the Guidelines on Count 1 (slightly more than 20 years), he will be 45 years old when he is released.  Considering his personal history and background, 20 years of incarceration is greater than necessary to meet the goals of sentencing.

- Mr. Culver's Criminal History Level, which is II, is based on two minor misdemeanor convictions and substantially over-represents the seriousness of his criminal history.

## II.    The Legal Standard

It is now clear that the Fourth Circuit will affirm a sentence substantially below the Guidelines as long as the district court takes care to weigh the factors set forth in 18 U.S.C. §

3553(a). *See, e.g.*, *United States v. Smith*, 2008 U.S. App. LEXIS 8794 at *9-10 (4th Cir. Apr. 23, 2008) (affirming downward variance from guideline range of 78-97 months to 24 month sentence in child pornography case because of defendant's lack of criminal history, age, family ties, involvement in a treatment program, and absence of allegation that defendant molested any children). In other words, in light of the Supreme Court's opinion in *Gall v. United States,* the sentencing guidelines range is truly <u>advisory</u> rather than mandatory. Rejecting the government's argument that sentences significantly outside the advisory guidelines range should be subjected to exacting scrutiny on appeal, the Supreme Court in *Gall* stressed that "the Guidelines are only one of the factors to consider when imposing sentence . . . ." *See United States v. Gall*, 128 S.Ct. 586 , 602 (2007). As the Court explained, the advisory guidelines sentencing range is only a "starting point and the initial benchmark" from which sentencing courts should begin to make their sentencing determinations. *Id.* at 596. That is because, pursuant to *United States v. Booker,* courts must consider the recommended guideline range as one of seven co-equal statutory sentencing factors enumerated in 18 U.S.C. § 3553(a). *Booker*, 543 U.S. 220, 259-60 (2005).

Those factors include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c) the guideline range, (d) the need to avoid unwarranted sentencing disparities, (e) the need for restitution, and (f) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a). Upon consideration of those factors, a sentencing court may find that the case falls outside the "heartland" contemplated by the

3

guidelines, or that "the guidelines sentence itself fails properly to reflect the § 3553(a) considerations," or that "the case warrants a different sentence regardless." *Rita v. United States*, 127 S.Ct. 2456, 2465 (2007). While the District Court must begin its analysis by correctly calculating the advisory sentencing range, the sentencing court is then free in light of the other statutory sentencing factors to impose an entirely different sentence. This is because, under *Rita,* a district court is free simply to disagree, based on the § 3553(a) sentencing factors, with the USSG's "rough approximation" of the appropriate sentence for any given case. *Id.*

The primary directive of § 3553(a) is to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. After *Booker* and *Gall,* therefore, sentencing courts must impose the minimum sentence that is sufficient to accomplish the objectives of § 3553(a). Moreover, there is no presumption that the advisory U.S.S.G. range is the minimally sufficient sentence that § 3553(a) requires this Court to determine and impose. *See Gall,* 128 S.Ct. at 596-97 (sentencing court "may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented.") (internal citation omitted). In *Gall,* for example, the Supreme Court found that a sentence of probation was "reasonable" in a case in which the Guidelines called for a sentencing range of 30-37 months, and reversed the Court of Appeals for failing to "reflect the requisite deference" to the District Court's sentencing decision. *Id.* at 598. Indeed, whatever sentence the court imposes after appropriately considering all the statutory sentencing factors – "whether inside, just outside, or significantly outside the Guidelines range" – must be reviewed by a Court of Appeals under a "deferential abuse-of-discretion standard" *See Gall,* 128 S.Ct. at 591 (reversing Court of Appeals and reinstating a probationary sentence where advisory sentencing range was 30-37 months).

Finally, in *Kimbrough v. United States,* 128 S.Ct. 558 (2007), the Court held that a district court is free under the advisory sentencing guidelines to sentence outside the advisory range on the basis of a disagreement with a policy determination made by the Sentencing Commission – in that case, the 100:1 sentencing disparities between "crack" and powder cocaine.  The Court held that "it would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case."  128 S.Ct. at 575.  In other words, a sentencing court is free under *Kimbrough* to disagree on policy grounds with a judgment of the Sentencing Commission even when the offense at issue falls squarely within the type of cases to which the Sentencing Commission intended a particular guideline to apply.

**III.    The Mandatory Minimum Sentence of 15 Years Incarceration is Sufficient to Satisfy the Statutory Purposes of Sentencing under 18 U.S.C. § 3553(a)**

    A.    <u>The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant</u>

Regarding the nature of the offense, there is no doubt that conspiracy to possess with intent to distribute cocaine and possession of a firearm in furtherance of a drug offense are very serious offenses, and for that reason Congress has mandated a minimum 15 years of imprisonment in this case.  Mr. Culver's history and characteristics, however, demonstrate that a Guidelines sentence of 188 to 235 months, plus five years, is excessive and that a sentence at the statutory minimum, 15 years, is sufficient and should be imposed.

Regarding the history and characteristics of Mr. Culver, he is 25 years old.  This is the first time he has been incarcerated.[1/]  Under a Guidelines-range sentence, he will be incarcerated for 188 to 235 months, plus five years, consecutive; that is a total sentence of 20 to 24 years.  *See* PSR, ¶ 81. If he is sentenced at the low end of the advisory Guidelines range, he will be incarcerated until he is approximately 45 years old.  If, however, he is sentenced at the statutory minimum (15 years), he will be incarcerated for a sufficiently substantial period of time – until he is 40 years old.

Mr. Culver graduated from Morgantown High School in Morgantown, West Virginia in 2002.[2/]  In the fall of 2002, he started college at West Virginia State University ("WVU").  PSR, ¶ 58.  While attending high school, he held two part-time jobs in Morgantown, including positions as a delivery driver for Domino's Pizza and as an assistant at Hastings Funeral Home.  While attending college, in 2002, Mr. Culver also started working at a nightclub, Elements, which later went under new management as Club Envy.  PSR, ¶¶ 68-70.

Mr. Culver attended WVU for three years before withdrawing to work full-time at the nightclub.  PSR, ¶ 66; Def. Ex. 1, p. 1.  He started at the position of mens' room attendant in 2002,

---

[1/]  Mr. Culver has been incarcerated since his arrest for the instant offenses on February 15, 2008.  PSR, ¶ 7.  Outside of the offense conduct, he has never before been charged with any felony offense, any drug-trafficking offense, or any firearm offense.  *See* PSR, ¶¶ 42-52.

[2/] Mr. Culver's father, Joe Culver, is 64 years-old.  Joe is a licensed attorney and has also worked as a journalist.  Since moving to Morgantown, he has been employed with the U.S. Department of Energy's National Energy Technology Laboratory in Morgantown.  He is currently a senior manager at the Office of Public Affairs.  PSR, ¶ 58.  Jubal's mother, Jessica Trotter, is 53 years old.  She lives in Clinton, Tennessee with her second husband.  She worked for the Knox County, Tennessee government as a computer management trainer until she retired in June 2008. PSR, ¶ 58.  Since entering retirement, she has been traveling across-country in an RV with her husband.  Mr. Culver's older brother Jesse is 27 years old and works at a restaurant in Morgantown. His younger sister Jolie is 24 years old and is a single, stay-at-home mother for her seven-month-old daughter. Jesse, Jolie, and Jolie's baby reside with Joe Culver.  PSR, ¶ 59.  Mr. Culver also has three older half-siblings from his father's two earlier marriages.  PSR, ¶ 60.

and was promoted a number of times "to bar back, to bartender, to bar manager, and eventually to general manager" by the time he was 22 years old.  Def. Ex. 1, p. 2; PSR, ¶ 68.  He states in his letter to this Court, "I worked very hard and very conscientiously to become general manager and I was very proud of my successful rise to that position, which fulfilled the goal I had of being in charge of the nightclub."  Def. Ex. 1, p. 2.

In addition to his commitment to hard work, Mr. Culver is known for his generosity and a review of the letters to the Court from Mr. Culver's close friends and family demonstrates that they view Mr. Culver as the "problem solver."

Mr. Culver's longtime friend, Lawrence Lazzell, states that "[a]ny time that a person was in need, Jubal would do everything in his power to resolve the situation with everyone benefitting,  this level of devotion and caring has always been present in Jubal towards his friends and family."  Def. Ex. 6, p. 1.  David Michael Lorenze, Mr. Culver's friend since high school, describes an incident in high school when "a large kid, commonly known as a school bully, was harassing a younger and smaller kid. ... [Mr. Culver] took up for the younger kid, without causing any problems with the well-known bully.  Jubal Culver is a great listener and has a unique knack for being able to resolve problems."  Def. Ex. 5, pp. 1-2.

In her letter to this Court, Mr. Culver's mother, Jessica Trotter, describes his generosity.  Def. Ex. 2, p. 1.  She states that Mr. Culver "is always trying to help his brother and sister and buying needed items for his niece."  She describes how when she and her husband visited Morgantown for the birth of her granddaughter, Mr. Culver paid their hotel bill to thank them for coming.  She states, "Of all my children, Jubal has been the one to make or buy special items for me. ...  At Christmas time, he is the one who buys the presents and then gives them to me and my husband from the three

kids [*i.e.*, Mr. Culver and his two siblings].  He puts a lot of thought into his gifts too.  He bought me and my husband a portable security camera for our RV motor home."[3/]

There is no explanation or justification for a defendant's decision to engage in criminal activity, particularly for Mr. Culver's offenses.  Nonetheless, background about Mr. Culver's involvement in the drug conspiracy may at least provide some context as to why he would make the bad decision to engage in a drug conspiracy and why he will not engage in criminal activity in the future.

Mr. Culver's mother describes how her son takes on the responsibility of protecting and providing for his two siblings and baby niece, particularly now that his father, the sole provider for Mr. Culver's two siblings, recently suffered a heart-attack:

> Jubal is the middle child and exhibits the "peacemaker" characteristics often associated with this birth order.  He has an older brother and a younger sister, both of whom are not very responsible.  He is always trying to help them get their lives together and I feel that they take extreme advantage of him.  If they get in trouble financially or into arguments with their father, Jubal jumps right into the middle of the situation to resolve the problems.  Unfortunately, this is how he got into the drug mess that he is in.  He thought if he could make enough money that he would be able to take care of his brother and sister and his 6-month old niece.  He's admitted to me that it was a stupid decision and regrets it ... [and] when he gets out [he wants to] earn money the "right" and "lawful" way.  His father had a heart attack earlier this year and he was afraid that he'd have to be the one to take care of his siblings.  As Jubal and I have discussed (at length), his motives were good, but his methods were not.

Def. Ex. 2, p. 1.[4/]

---

[3/] It should be noted that because the drug transaction failed, Mr. Culver never obtained any drug proceeds and these items were not purchased with any illegally-obtained proceeds.

[4/] Mr. Culver's father also comments that "Jubal's siblings lack his work ethic.  I worry that neither of them have the discipline right now to be self sufficient.  Jubal and I discussed that situation several times and I told him he might have to be in a position to help them out when I'm no longer able.  (I'm 64 yeas old, 65 on August 19, and I hope to retire at some point.)." Def. Ex. 3, p. 2.  Mr.

The evidence presented by the government, including Mr. Culver's testimony as a primary government witness,[5] at the trial of Mr. Culver's co-conspirators during the week of July 21, 2008, establish that in November 2007, Mr. Culver agreed to assist an older, prominent, local business owner, Fares Abulaban, in distributing 20 kilograms of cocaine to be purchased from an undercover agent on the night of February 15, 2008.  Mr. Culver's clientele at the nightclub included drug dealers who traffic in large amounts of cocaine.  Mr. Culver's role in the conspiracy was two-fold. He contacted two buyers who together were to purchase 15 kilograms of cocaine on February 15. He also assisted Mr. Abulaban in organizing the February 15 transaction at the nightclub he managed.  Mr. Abulaban agreed to pay Mr. Culver $5,000 in exchange for Mr. Culver's assistance as a broker and organizer.  *See also*, Indictment, March 13, 2008; Statement of Facts, filed May 7, 2008 (signed by Jubal Drake Culver); PSR, ¶¶ 16-32.[6]

Because Mr. Culver did not intend to purchase any illegal substances at the transaction, he did not bring any money to the February 15, 2008 meeting.  Because the drug transaction was not successfully executed, Mr. Culver did not receive any drug-trafficking proceeds.

At the time of the offense, Mr. Culver owned a .9 mm Beretta semi-automatic handgun and had a permit to carry a concealed weapon.  He regularly carried his firearm to work, wearing it in a

_____

Culver's older half-sister, Jade Wooten, also states that his siblings Jesse and Jolie are "100% dependant on our dad for everything and they are draining our dad financially dry. ... I know he felt he needed to help our dad and was worried about the effect they were having on him.  Our dad is in poor health and I fear that placed even additional pressure on Jubal."  Def. Ex. 4, p. 2.

[5] The March 13, 2008 Indictment lists 19 defendants.  PSR, ¶ 2.  Mr. Culver was the first of the 19 defendants to enter a plea of guilty.  *See* PSR, ¶¶ 6, 9-15.

[6] Mr. Culver did not play a role in determining the drug weight; the drug weight of 20 kilograms was negotiated by Mr. Abulaban and the undercover agent.  PSR, ¶ 19.  Mr. Culver's duties were to contact potential buyers and assist Mr. Abulaban in organizing the transaction.

holster, because he closes the nightclub late at night when there is typically a large amount of cash in the club.  There are no allegations that Mr. Culver used his firearm in relation to criminal activity prior to this offense.  On the night of the drug transaction, Mr. Culver carried the firearm into the nightclub and abandoned it in the walk-in cooler during the police raid.  He was arrested during the raid and a few days later, he instructed a friend to retrieve his firearm and cell phone from the nightclub and secure it in a safe in his father's home.  The friend did so and the government later retrieved the firearm.  PSR, ¶ 31; Defendant's Opposition to the Government's Motion for Revocation of Release Order, March 19, 2008; Indictment, March 13, 2008; Statement of Facts, filed May 7, 2008 (signed by Jubal Drake Culver).

In retrospect, Mr. Culver sees that his efforts to make fast cash by engaging in illegal activity were, in his words, "stupid."  Def. Ex. 1, p. 2.[7]  Mr. Culver recognizes that it was his choice to embrace a lifestyle of abusing alcohol and illegal drugs and that choice played a part in his ultimate "bad decision[], both morally and legally" to engage in the drug conspiracy.  Def. Ex. 1, p. 2.  Mr. Culver used cocaine, marijuana, and alcohol at least twice a week up to the time of his arrest in February 2008.  PSR, ¶ 56.  He states in his letter to this Court:

> As general manager, I was responsible for every aspect of running a multi-million dollar business.  As a result, I developed a drinking habit, and a drug problem.  This lead me down the path that inevitably got me where I am today.  I was associating with the wrong crowd, and I was making bad decisions, both morally and legally.  The climax of bad decisions was to become involved with Mr. Abulaban and this conspiracy for which I was arrested.

Def. Ex. 1, p. 2.

---

[7] Mr. Culver's older half-sister Jade Wooten also states that he "has repeatedly told me [by phone] that he made a horrible, stupid mistake and how much he regrets it.  He has never tried to justify or defend what he did; rather he acknowledges his responsibility without making excuses for it."  Def. Ex. 4, p. 2.

During his current period of incarceration, Mr. Culver has "had time to clean out [his] body and mind" and he already recognizes that because of his bad decisions, he has seriously injured his family and lost the opportunity to start his own family and a career during the prime of his life:

> Since being arrested, I have had time to re-evaluate my life and my actions. I realize how incredibly stupid I was being. I also realize what is most important to me: My family and the prospect of starting my own household. Every day I speak to my Mom and Dad [by phone from the ADC], and I am reminded of how much I have hurt them. ... It upsets me greatly to think of the disappointment, shame, and pain they must feel for what I have done. I am extremely remorseful for what I have done. I did not consider the consequences of my acts. ... I want ... to prove to the court, my family, myself, and society that I am a good person who can be successful and who can contribute to the nation. I want to make my family proud, not disappointed.
> ... I am extremely sorry for what I have done. I have had time to clean out my body and mind, and I realize how wrong I was for what I did. ...

Def. Ex. 1, pp. 2-4.

Outside of his offense conduct, Mr. Culver's personal history and characteristics demonstrate that he has great promise to be a productive, law-abiding member of society when he is released. A longtime friend of Mr. Culver's writes, "In my opinion, my friend, Jubal Culver, is the textbook example of a great person who got mixed up with the wrong crowd. Jubal trusted a wealthy, successful business owner and allowed this man to steer him down a destructive path... . [These bad influences] blinded Jubal's decision making abilities and temporarily led him astray from his core moral values." Def. Ex. 5, p. 2. Another friend writes, "I am truly surprised that Jubal could be involved in a conspiracy of this magnitude. I feel that I know Jubal Drake Culver very well and that he was obviously seduced by an older successful public figure, which saw a great opportunity in having a person of Jubal['s] caliber [become a] part of his criminal organization." Def. Ex. 6, p. 1.

In his short adult life, Mr. Culver has completed three years of college.  He has demonstrated the kind of work ethic that lifts an employee from bathroom attendant to manager of the entire establishment within a few years.  While incarcerated, he intends to complete his undergraduate degree and obtain a masters degree in either business or accounting so that when he is released he will be equipped to start a new career and move forward with starting his own family.

Indeed, Mr. Culver has already begun his rehabilitation through his activities at the Alexandria Detention Center ("ADC").  Since June 2008, Mr. Culver has been a unit trustee at the ADC – a position of trust that must be earned.  Among other duties, he is responsible for working in the kitchen preparing food, maintaining kitchen supplies, and doing inventory control.  He works seven days a week from 1:30 p.m. to 7:00 p.m.

Mr. Culver's conduct while in custody shows not only the seriousness with which he takes this case, but also his resolve to do what is necessary to come out of this experience a better person than he was when he went into custody.  That custody also has had the effect of depriving him of illegal drugs and, for the first time in many months, Mr. Culver is clear in his thoughts about what he wants his future to be.

Although Mr. Culver and his family have decided that after his release they will not remain in Morgantown, the place where he made bad decisions that have hurt himself, his family, and, potentially could have hurt, the community, business professionals in Morgantown who have known Mr. Culver for about ten years have submitted letters stating that he is a motivated worker, an adept businessperson, and, based on their long relationships with him, they believe he will be a great asset to the community when he is released.  *See* Def. Exs. 5, 6, 7.

Mr. Culver violated serious drug and firearm laws and he should be punished by a substantial term of imprisonment of 15 years.  Considering his personal history, characteristics, and his minor criminal record, a below-Guidelines sentence of 15 years is appropriate and should be imposed.

B.       The Kinds of Sentences Available

A sentence of imprisonment is required by the applicable statutes.  The sentence must be between 15 years and life imprisonment, which must be followed by a period of supervised release of at least five years.  A fine is also permitted, but Mr. Culver agrees with the PSR's conclusion that he lacks the ability to pay a fine.  *See* PSR, ¶ 70.

C.       The Advisory Guidelines Range and Policy Statements of the Sentencing Commission

The PSR accurately states that the base offense level is 34, a two-point enhancement applies under § 3B1.1(b) for role in the offense, a two-point enhancement applies under § 3C1.1 for obstruction, and Mr. Culver qualifies for a three-point reduction under Chapter Three.  Therefore, the offense level is 35 (34+2+2-3).[8/]  Mr. Culver's Criminal History Category is II.  His advisory Guidelines range for Count 1 is 188 to 235 months.  His Guidelines range for Count 4 is five years, to be served consecutively.  PSR, ¶¶ 79-87.

D.       The Need for Restitution

Restitution is not applicable in this case.

---

[8/] Mr. Culver stipulated to the offense level, including the enhancements, in the plea agreement.  PSR, ¶ 8.

E.      The Need for the Sentence to Reflect the Basic Aims of Sentencing: Retribution, Deterrence, and Incapacitation

Mr. Culver submits that a sentence of 120 months (64 months below the advisory Guidelines range) for Count 1 and a sentence of five years for Count 4 is sufficient and not greater than necessary to meet the goals of retribution, deterrence, and incapacitation.  Further, Mr. Culver submits that a sentence longer than that is greater than necessary to accomplish the purposes of sentencing and should not be imposed.

Regarding the need to accomplish specific and general deterrence, the U.S. Sentencing Commission states that "[c]riminal history points represent the purest form in which the guidelines measure recidivism risk" and that "the criminal history points have a greater prediction power than do the [criminal history categories]." *See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, U.S. Sentencing Commission, May 2002, at pp. 7, 11. According to the empirical evidence gathered by the U.S. Sentencing Commission, given that Mr. Culver has two criminal history points (PSR, Worksheet C), his likelihood of recidivism is only 3.6%.  *Id.*, at Ex. 4.

Mr. Culver has attended three years of college and was gainfully employed, ultimately at a management position, for at least six years prior to the offense.  The U.S. Sentencing Commission's research shows that defendants with stable employment and some college education are less likely to recidivate.  *Id.*, at Ex. 10.  It is also notable in this case that Mr. Culver is 25 years old and that should the Court impose the mandatory minimum sentence, he will be approximately 40 years old by the time he is released.  As the Sentencing Commission has recognized and proven with its own data, "[r]ecidivism rates decline relatively consistently as age increases." *Id.*, at 12.

14

In *United States v. Harris*, No. 1:08cr45, 2008 WL 2228526, at *5 (E.D. Va., May 29, 2008), this Court held that the Guidelines range for that defendant was "greater than necessary to achieve the purposes set forth in § 3553(a)(2)" and departed downward by 74 months to 188 months in part because this Court found that a non-Guidelines sentence was sufficient to satisfy § 3553(a)(2) (which considers "the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendaant with needed education or vocational training ...").  As this Court explained in *Harris*:

> First, given that Defendant is 31 years old, even if he is sentenced to the mandatory minimum, he will be at least 41 years old when he is released.  The Sentencing Commission has found that recidivism rates decline relatively consistently as the age increases, and Defendant's age and criminal history predict a 42.7% likelihood of recidivism.  *See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, U.S. Sentencing Commission, May 2002, at 12, Ex. 9.  In addition, prior to the instant offense Defendant has not been convicted of a crime since 1998.  This substantial lapse in time between convictions, coupled with his age upon release even if he is only sentenced to the mandatory minimum, indicates to the Court that a sentence of 262 months would be much greater than necessary to protect the public from Defendant's future crimes.

*Harris*, 2008 WL 2228526, at *5.[9/]

Moreover, unlike *Harris*, in this case, Mr. Culver's particular personal history and characteristics provide additional grounds to sentence him below the Guidelines at the very serious sentence of 15 years.  As explained above (*see* Part III.A., *supra*), Mr. Culver's personal history and

---

[9/] In *Harris*, the defendant had not committed a crime for eight years (the defendant had not committed a crime since 1998 and the offense conduct occurred in 2006).  *Harris*, 2008 WL 2228526, at *1, *5.

15

characteristics show a small likelihood of recidivism.  In fact, his personal history and characteristics show a great potential to contribute to society upon completion of his sentence.

Here, Mr. Culver seeks a downward departure on Count 1 of 68 months so that the total sentence imposed is 180 months (120 months for Count 1 plus 60 months for Count 4), or 15 years. The statutory minimum of 15 years sufficiently reflects the seriousness of the offense, will promote respect for the law, will provide just punishment, will deter future crimes, and will protect the public. In this case, the defendant is 25 years old and has not previously been sentenced to a term of incarceration.  Even if he is sentenced to the mandatory minimum, he will be approximately 40 years old when he is released.  As the statistics set out above indicate, Mr. Culver's likelihood of recidivism is minimal.

## IV.   Because Criminal History Level II Substantially Over-represents Mr. Culver's Criminal History, Level I Should be Applied and A Sentence of 48 Months Below that Guideline Range Should be Imposed

Criminal History Level II substantially over-represents Mr. Culver's criminal record.  If sentenced under Criminal History Category I and offense level 35 (38-3 for acceptance), his advisory Guidelines range will be 168 to 210 months for the drug-trafficking offense and an additional five-year term for the firearm offense.  For the reasons stated above, a sentence that is 48 months below the suggested 168 to 210 range – that is, 120 months for Count 1 and five years for Count 4 – is sufficient in this case.

There are three reasons why Criminal History Category II substantially over-represents Mr. Culver's criminal history:  (1) his Criminal History Score is based on two relatively minor misdemeanor convictions, DUI and destruction of property; (2) the offense conduct for the two convictions occurred in January and July 2002, nearly six years prior to the offense conduct in this

16

case; and (3) Mr. Culver was relatively young at the time of those offenses – he was 18 years old during the DUI offense conduct and 19 years old during the destruction of property offense. *See* PSR, ¶¶ 47-48.

Application Note 3 of § 4A1.3 gives an example of when a downward departure to correct an over-represented criminal history is appropriate:

> 3. Downward Departures.—A downward departure from the defendant's criminal history category may be warranted if, for example, the defendant had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period. ...

*See also United States v. Pinckney*, 938 F.2d 519, 521 (4th Cir. 1991); *United States v. Adkins*, 937 F.2d 947, 952 (4th Cir. 1991) ("Criminal history" is, relatively, one of the most flexible concepts in the guidelines.); *accord United States v. Summers*, 893 F.2d 63, 65-67 (4th Cir. 1990) (affirming downward departure based on over-represented criminal history where the defendant had "convictions for grand larcenies, possession of narcotics, a weapons violation, driving with suspended license violations and probation revocation.").

Here, the PSR calculates Mr. Culver's Criminal History Category at II based on a total of two criminal history points. PSR, Worksheet C. The two points arise from two misdemeanor convictions in 2002 and 2003. One point was assessed for a 2002 conviction for DUI in which Mr. Culver received a sentence of payment of a $350 fine and completion of 24 hours of community service. Mr. Culver was 18 years old at the time of the offense. PSR, ¶ 47. The second criminal history point was assessed for a 2003 conviction of destruction of property in which Mr. Culver received a sentence of six months of incarceration, suspended, two years of supervised probation, and restitution. Mr. Culver was 19 years old at the time of the offense. PSR, ¶ 48.

A district court can accomplish a downward departure under § 4A1.3 by excluding one or more offenses from the calculation of the defendant's Criminal History Category Score. *United States v. Nelson*, 166 F. Supp. 2d 1091, 1096 (E.D. Va. 2001) (Lee, J.) (excluding certain offenses from the Criminal History Category Score due to "the non-violent nature of the offenses as exhibited by the minimal punishment Defendant received."). For example, in *United States v. Ward*, 908 F. Supp. 350, 353 (E.D. Va. 1995) (Ellis, J.), the district court departed from Criminal History Category II to Category I because the defendant's score was two points and "[o]ne of the criminal history points is attributable to a nine and a half year old DUI conviction." The court stated that "[b]ut for that conviction, defendant would fall within criminal history category I." *Id.* Accordingly, the court excluded that DUI conviction from the defendant's criminal history score because "a criminal history category of I better reflects [the] risk [of recidivism] and the seriousness of defendant's criminal history." *Id.*

Similarly, in this case, Mr. Culver's criminal history is based on two points, one of which is attributable to a DUI conviction from 2002 when he was 18 years old. But for that conviction, Mr. Culver would fall within Criminal History Category I. By excluding that conviction from his criminal history, this Court can deduct one-point from his Criminal History Score and sentence him within Criminal History Category I, which better reflects his criminal history.

## **CONCLUSION**

For the foregoing reasons, Mr. Culver respectfully submits that a sentence of 15 years (120 months for Count 1 and five years for Count 4) is sufficient to accomplish the purposes of sentencing in this case, and should be imposed.

18

Respectfully submitted,
JUBAL DRAKE CULVER

By Counsel,

Michael S. Nachmanoff,
Federal Public Defender

July 26, 2008

By: _____/s/_____
Aamra S. Ahmad
Assistant Federal Public Defender
Va. Bar. #75929
Counsel for Mr. Culver
1650 King St., Suite 500
Alexandria, Virginia 22314
(703) 600-0800 (tel.)
(703) 600-0880 (fax)
Aamra_Ahmad@fd.org

## EXHIBITS

| | |
|---|---|
| 1 | Letter from Jubal Culver (redacted), July 4, 2008 |
| 2 | Letter from Jessica Trotter (Mr. Culver's mother), May 9, 2008 |
| 3 | Letter from Joe Culver (Mr. Culver's father), May 9, 2008 |
| 4 | Letter from Jade Wooten (Mr. Culver's sister), June 2, 2008 |
| 5 | Letter from David Lorenze (Mr. Culver's friend), July 21, 2008 |
| 6 | Letter from Lawrence T. Lazzell (Mr. Culver's friend), July 22, 2008 |
| 7 | Letter from Ted Hastings (Mr. Culver's friend), July 22, 2008 |
| 8 | Letter from Cheryl L. Finkbeiner (Mr. Culver's aunt), July 17, 2008 |

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of July 2008, I will electronically file the foregoing pleading with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to:

Lawrence J. Leiser
Assistant United States Attorney
2100 Jamieson Ave.
Alexandria, Virginia, 22314

A copy of the foregoing pleading will also be served by facsimile to:

Carla G. Coopwood
Senior U.S. Probation Officer
10500 Battleview Parkway
Manassas, Virginia 20109
Fax: 703-366-2150

Pursuant to the Electronic Case Filing Policies and Procedures, a courtesy copy of the foregoing pleading will be delivered to Chambers within one business day of the electronic filing.

_____/s/_____
Aamra S. Ahmad
Assistant Federal Public Defender
Va. Bar. #75929
Counsel for Mr. Culver
1650 King St., Suite 500
Alexandria, Virginia 22314
(703) 600-0800 (tel.)
(703) 600-0880 (fax)
Aamra_Ahmad@fd.org

21